BALDWIN DRAINAGE DISTRICT, a corporation, et al., v. MAC-
CLENNY TURPENTINE COMPANY, et al.

| | |
|---|---|
| 18 So. (2nd) 792 | January Term, 1944 |
| April 4, 1944 | En Banc |
| Rehearing Granted May 17, 1944 | |

*Giles J. Patterson* and *John W. Harrell,* for petitioners.

*Thos. B. Adams,* for respondents.

THOMAS, J.:

In this appeal, presented by certiorari, we are asked to test the propriety of the chancellor's order denying motions to dismiss the bill of complaint and to strike certain sections of that pleading. Our first task is an analysis of the bill, which is of considerable length.

The plaintiffs are owners of property or holders of liens on property situated within Baldwin Drainage District which "claims to be a public corporation . . . by virtue of a . . . Decree entered [by the circuit judge] . . . on the 19th day of January, A. D. 1916. . . ." This decree "described the outside boundaries of three whole townships, . . . but described no properties nor the ownerships thereof within said boundaries . . . except . . . certain railroad properties . . . expressly excluded. . . ." Defendants were the drainage district, its supervisors, and the holders of its bonds.

Appellees acquired title in various ways to the respective pieces of property involved, some of it by conveyances from the grantees in tax deeds executed as early as 1929 and as

late as 1937, some through persons who were owners at the time the drainage district was created, some through masters' deeds executed pursuant to mortgage foreclosure, and on still other parcels tax certificates are held.

After the creation of the district and at a time when Sec. 22, Chapter 6458, Laws of Florida, Acts of 1913, was in effect the then supervisors authorized three bond issues. In the first one, for $300,000, the "Drainage Tax Record" was certified and filed October 30, 1916; in the second, for $150,000, this record was filed March 11, 1920; and in the third, for $110,000, it was filed August 31, 1921. To each of these records was attached a certificate, in accordance with Sec. 22 of Chapter 6458, supra, that the taxes defined therein and to be levied in the future were a lien subject only to the lien of the state for general, county, school, and road taxes. It was alleged that during the existence of the drainage district the lands of the plaintiffs had become parts of special road and bridge and tax school districts, and taxes had been levied on them for general purposes and the service of bonds issued by counties and districts. It was charged that issuance of "tax deeds pro tanto discharged and cancelled the [bond] issues . . . whether . . . valid or invalid," or, as it is otherwise stated in the bill: "That in any event the grantees . . . through whom . . . plaintiffs . . . claim . . . received independent titles from the State . . . wholly unaffected by anything done or omitted . . . by any of the former owners of said lands."

The theory of the bill to this point was that, as far as lands held under tax deeds were concerned, the issuance of tax deeds created an independent title from the State of Florida free of all liens for debt service or maintenance purposes and if that position be not sustained then the owners under those instruments were privileged to attack the validity of all levies for drainage regardless of any position assumed by the former owners of the legal title.

We pause here to determine the first proposition, namely, whether title of property acquired by tax deed was unencumbered by the lien of taxes levied for maintenance of the drainage system and payment of bonds which had been issued

to install it. It is the contention of the appellees that the tax certificates were issued evidencing levies for general tax purposes prior to the enactment of Chapter 12040, Laws of Florida, Acts of 1927, F.S.A., Sec. 298.36, 298.41, 298.47, 298.51, and at a time when Chapter 6458, Laws of Florida, Acts of 1913, was in force. Section 22 of the latter provided that "all drainage taxes provided for in this Act . . . shall, from the date of assessment thereof until paid, constitute a lien, to which only the lien of the State for general State, County, school and road taxes shall be *paramount*" and required that the certificate of the drainage tax lien should contain a declaration to like effect. In the amendatory Act, Chapter 12040, supra, it was provided that the drainage taxes should "constitute a lien of *equal dignity* with the liens for State and County taxes. . . ." F.S.A. Sec. 298.41. (Italics supplied.)

It is the gist of the appellees' argument, then, that until the effective date of this law state and county taxes were superior to drainage taxes, and deeds based on certificates issued for nonpayment obliterated the inferior liens of the drainage taxes.

In reply to this argument the appellants assert that the rights of the purchaser of the tax certificate are those defined by the law in force at the time it is acquired. Clark-Ray-Johnson Company v. Williford, 62 Fla. 453, 56 So. 938. Assuming, as we may, that the tax certificates forming the bases of the deeds described in the bill were purchased at or about the time the deeds issued it seems to us that this principle of law announced in the cited case governs. The rule has lately reiterated in Culmer, et al., v. Office Realty Company, 137 Fla. 675, 189 So. 52. We have the view that tax certificates purchased subsequent to the amendatory act evidenced liens of equal dignity to those taxes levied for maintenance purposes and to retire bonds issued for the construction of the district. Being of equal dignity with taxes levied for state and county purposes they were not cancelled by the sale of property for state taxes and issuance of certificates therefor. Bice v. Haines City, et al., 142 Fla. 371, 195 So. 919; Carlile v. Melbourne-Tillman Drainage Dist., et al., 143 Fla. 355, 196 So. 687.

On the second phase of this attack, the plaintiffs' position that if the court should hold the tax liens of equal force all the plaintiffs might challenge the incorporation and existence of the district, much is alleged. Before enumerating the defects claimed, of which plaintiffs insist they may take advantage, it is well to emphasize that this district was created in 1916, approximately 27 years before the bill of complaint was filed. It was averred that: (1) neither the published notice of application to form the district nor the decree contained the names of property owners except two railroad companies, properties of which were excluded; (2) the descriptions of the various properties were not incorporated; (3) no schedule of lands was attached to the notice; (4) the court exceeded its jurisdiction because the lands within the boundaries described in the decree "were not a contiguous body of wet or overflowed lands or lands subject to overflow within the meaning and intent of [the] General Drainage Law"; (5) the lands within the limits defined constituted four distinct water sheds so independent of one another that four systems would have been necessary to accomplish effective drainage; (6) the money was "wasted or spent" on property in certain areas which could have resulted in no possible benefit to lands of the plaintiffs, a waste and expense attributable to the illegal construction contracts, alteration of plans of reclamation, and the like; (7) plaintiffs were not parties to the petition to incorporate the district—obviously they could not have been, as they obtained their property long afterward—and those who had signed the petition were laymen unfamiliar with the law and the physical characteristics of the proposed district; (8) the court had no jurisdiction to enter the decree confirming assessments of benefits because the notice of filing the commissioners' report did not contain a schedule of the lands affected by it; (9) there was no basis for an order confirming assessments of benefits for the reason that the commissioners failed to inspect the property and instead arrived at benefits by "an arbitrary formula" relying upon information furnished in the plan of reclamation of the engineers, which was theoretical rather than practical; (10) the commissioners could not have

performed their duties because of the short period of time between their qualification and the filing of the report, the existence of only one highway through the area, and the federal weather report for August, 1916, having shown that immediately preceding the filing of the report there was an excessive rainfall which affected swamp areas such as then existed in the district in considerable numbers; (11) the commissioners' estimates were ipse dixit without sufficient consideration to the benefits which individual units in the district would receive; (12) the district generally has not been benefitted by the drainage plan and there has been no appreciable difference in the value of the land within and the land surrounding it; (13) the assessments of benefits bore no relationship to costs.

At the outset we referred to the drainage tax records filed in connection with the bond issues. These are claimed to have been defective because (1) descriptions of lands situated in only one county (Duval) were given and (2) these records were vitiated by the imperfections in the decrees which have already been given.

The certificates of the officers of the district forming the bases for the collection of taxes from 1916 to 1923 were alleged to have been false because the decree organizing the district did not contain the names of the owners nor the descriptions of the lands, and the levies invalid for these reasons. Such certificates in subsequent years were said to have been false also because "the lists of lands did not [so far as the lands of the plaintiffs were concerned] show either the names of the owners as they appeared in the decree of the circuit court organizing said District or the then present owners of said lands."

The tax and installment levies were charged to have been void because no proper assessment of benefits had been made, no proper order or decree confirming them had been entered, plaintiffs' lands had never been legally incorporated within the district.

The remainder of the bill was devoted to the propositions that: the bonds issued by the drainage district were not general obligations constituting unconditional promise to pay;

the contracts awarded for construction of the canals and bridges in 1916 and 1918 were improperly let and performed, and the latter were collusive, fraudulent, and against public policy; further, all installment taxes were illegal because construction work done in 1918 was based on improper alteration of the original plan of reclamation, and the bonds of the second and third issues were illegal for the same reason.

Before passing to the next aspect of the bill of complaint we pause to comment that the pleader elaborated on all the objections which we have detailed, specifically describing the proportions and construction of the canals and bridges in various parts of the area, their advantage to the adjacent land and to the district as a whole. The objections ran the full gamut of the district's existence from its very inception and included a severe indictment of the plan of reclamation prepared by the engineers.

The court was asked to declare the original incorporation decree entered in January, 1916, and the one confirming the assessments of benefits entered in October, 1916, null and void; to decree all drainage taxes levied prior to the issuance of the tax deeds cancelled; to determine the various steps taken in the formation of the drainage district illegal; to enjoin the drainage district from levying any further maintenance or installment taxes against the lands of the plaintiffs, et cetera.

Reduced to a simple statement, the bill constituted an assault in 1943 against the drainage district incorporated under general law in 1916, and the assessment made by it. As we have said, there was a motion to strike parts of the bill of complaint, but it seems to us that the vital point in the controversy is whether the whole bill should not have been dismissed upon motion on the ground of estoppel by acquiescence. In other words, had the plaintiffs, who acquired property in the district in comparatively recent years, the right to challenge the incorporation and thus undermine the securities when so much time had passed during which their predecessors could have, by numerous methods, contested not only every step of the proceedings culminating in the formation of the district but the actions of the officers in the

fulfillment of the plan of drainage? It seems a late date for comparative strangers to criticize, for instance the width and depth of a ditch, the practicality of placing drainage water sheds in the same reclamation area when the whole scheme was contrived by engineers a quarter of a century ago and soon afterward placed in operation, with benefit of monies delivered by the purchasers of bonds, of whom appellants may be said to be successors.

When bonds have been sold, the proceeds received and expended by those over whom the lenders had no control but who represented and acted for the property owners and tax payers in the district, the supervisors had approved the plans of the engineers employed by them, and contractors have, to the apparent satisfaction of the officers and without protest from those who were to bear the tax burden of the district, performed their work in accordance with those plans it is too late for the successors of those who could have complained of irregularities, if any there were, at the time they were happening, to repudiate the obligations of the district.

A direct attack was made upon the Baldwin Drainage District only two years ago when the Attorney General sought a writ of quo warranto in this court challenging its right to exercise its franchise and powers. Some of the co-relators there were plaintiffs here.

In disposing of the case the court expressed the view that the writ should not issue because the district had been created under the statutes, had been "recognized by the statutes as having at least a de facto existence with jurisdiction and powers, pursuant to which contractual and other rights [had] been acquired and not fully discharged. . . ." State, by Watson, Atty. Gen., et al., v. Covington, et al., 148 Fla. 42, 3 So. 521. This expression seems to have settled the point whether the district as such should continue in existence, and we now redeclare that it had and has in any event de facto status rendering it invulnerable to direct or, of course, collateral attack.

We apprehend that the appellees must have found comfort in the remainder of the above order which we now quote: "If individual co-relators are entitled to relief upon

the ground that their lands in the district have not been and cannot be in any way benefitted by being included in the drainage district, and taxation of such unbenefitted lands violates organic property rights which have not been lost by acquiescence or otherwise, the allegations of the information are insufficient even if the relief can properly be obtained by quo warranto proceedings." Thus it was suggested that some relief might be available to the individuals against taxes upon their property for benefits not forthcoming, if the property rights had not been lost by *"acquiescence* or *otherwise."*

This seems the focal point of the present litigation.

Among other grounds appearing in the motion to dismiss the bill was the one that the plaintiffs had failed to show that any owners of the lands described voiced any objection to the organization of the district, the assessment of benefits, the levy of taxes, or any of the acts now challenged or that any of their successors protested until the filing of the present bill. These circumstances, say the demurrants, established estoppel.

When the chronology of relevant events from the organization of the district to the filing of this bill is studied the soundness of the position is immediately apparent.

Evidently the proceeds from the issuance of the bonds now held by the appellants had been expended by the drainage district in consummation of the plan of reclamation many years before claim was made by appellees that their organic rights had been violated. It is fair to presume that their predecessors in title, the persons owning the lands from the time the district was created until those monies were expended, did not contest formation of the district, practicality of the plan, determination of the benefits, or expenditure of the proceeds. Doubtless appellees knew, when they became interested in the property in the district, its history or could easily have informed themselves by an examination of the public records.

We are prompted here to draw attention to the reference in State, by Watson, Atty. Gen. v. Covington, supra, to "contractual and other rights . . . acquired and not fully dis-

charged" pursuant to the "jurisdiction and powers" of a district of at least de facto status.

A circumstance of material significance is the effect upon other property owners, those who have paid their taxes from year to year, were the appellants favored with the decree they sought. Such relief would disrupt the original plan of distributing the burden at a time too late to revise it.

It would be futile here to detail the many opportunities given any disgruntled land owner to contest the formation of the district, the consummation of the drainage project and its subsequent management. We are unable to attach much weight to the argument that in considering the rights of appellant-bondholders we should be influenced by the comparatively recent date they acquired their securities, for it is obvious the appellee-property-owners appeared on the scene long after the expenditure of the money which the district became obligated to repay.

For the reasons which we have pointed out we conclude that the motion to dismiss should have been granted because of the extensive period of time which elapsed between the formation of the district and the filing of the bill in this case, which clearly establishes, in our opinion, acquiescence on the part of those who could have protested. See Rulare Irrigation District v. Shepard, 185 U.S. 1, 22 Supreme Court 531, 46 L. Ed. 773.

Having this conviction we find it unnecessary to comment upon the various phases of the bill presented in the motion to strike.

Certiorari is granted and the order denying the motion to dismiss the bill of complaint is quashed with directions to enter an order dismissing the bill.

TERRELL, BROWN, ADAMS and SEBRING, JJ., concur.

CHAPMAN, J., dissents.

BUFORD, C. J., disqualified.

CHAPMAN, J., dissenting:

The Baldwin Drainage District, comprising an area of approximately 86,000 acres, situated in Duval and Nassau counties, Florida, was organized by a decree of the circuit Court on January 19, 1916, under the several provisions of Chapter 6458, Acts of 1913, Laws of Florida (Sections 298.01

to 298.72, Fla. Stats. 1941). Shortly thereafter a meeting of the land owners of the drainage district was held; Supervisors for the drainage district were elected, and a firm of engineers employed, with instructions to make a survey of the land within the district, and prepare and submit to the supervisors plans for reclamation. Subsequently the engineers' report was filed with the supervisors, which, after being studied and considered by them, was ultimately approved or adopted as the appropriate reclamation plans of the district.

On August 21, 1916, pursuant to Chapter 6458, *supra,* the circuit court, acting upon a petition of the supervisors of the Baldwin Drainage District, appointed designated Commissioners to view the drainage area, with instructions and authority to assess benefits and damages to all the lands within the district necessary to the execution and carrying out of the plans of reclamation of the drainage district as proposed by the engineers and adopted by the supervisors. The appointed commissioners viewed the property, made estimates of benefits and damages to all the land situated in the drainage area, and, pursuant to notice, on August 29, 1916, filed their written report with the Clerk of the Circuit Court of Duval County, Florida.

Notice was published to the effect that the written report of the commissioners would be considered and acted upon by the circuit court as prescribed by the aforesaid Act, and, accordingly, on October 4, 1916, the estimates of the benefits and damages to the lands within the district necessary to the reclamation plans were by an order of the circuit court ratified and duly confirmed. The report of the commissioners as confirmed by the circuit court estimated the cost of the drainage program of the district, in conformity with the plans of reclamation, at the sum of $304,602.60, while the benefits thereof accruing to the landowners of the area were estimated at approximately $2,300,000.00.

The supervisors of the district, as authorized by the terms of the Act, some few days thereafter, awarded a drainage contract to a designated engineering firm. The contract called for the construction of ditches, laterals, canals, observing watersheds, etc., within the district, according to the approved

plans of reclamation. The supervisors of the drainage district agreed by the terms of the contract to pay for this work and the engineering firm contracted to perform it according to the reclamation plans for the sum of $294,000.00.

One of the controlling features incident to the reclamation program was the employment of common labor, the cost of which materially increased with the outbreak of World War I; this increase in cost of labor, a material item to the drainage program, was not contemplated by the parties to the contract when signed, and the net result thereof was a renegotiation and signing of a second contract between the supervisors and another firm for the reclamation program, based on the increased cost of labor, and with some alterations or modifications of the original plans of reclamation. The issuance by the district of bonds authorized by Chapter 6458, *supra,* and the sale thereof and from the proceeds of the sale the reclamation work could be carried out. The new or second contract providing for drainage of these lands was financed in this manner.

The Baldwin Drainage District, acting through its authorized officers, issued and sold bonds in the sum of $300,000.00, and with this money prosecuted the work of the reclamation, but the sum was inadequate to complete the drainage program, and, accordingly, a second issue of bonds of the drainage district in the sum of $150,000.00 was sold and the proceeds of the sale applied to the reclamation project, but the second issue failed to complete the drainage program as prescribed by the plans of reclamation. The third issue of bonds in the sum of $110,000.00 was sold and the amount applied to the reclamation work, but the sum was inadequate and the reclamation program was still incomplete. Benefit assessments, as authorized by law, were made against the lands of the district, and the accumulations thereof, or the several amounts now unpaid, it is represented on this record, now exceed several times, in many instances, the market value of the property against which these liens attach.

On January 21, 1943, some of the owners of lands situated within the Baldwin Drainage District filed in the Circuit Court of Duval County, Florida, their amended bill of complaint in

chancery against the drainage district, its trustees, supervisors and bondholders. These defendants filed a motion to dismiss the amended bill of complaint on some thirteen separate grounds, and, after argument of counsel and after a careful consideration thereof, the same was by the chancellor denied under date of April 3, 1943, thereby concluding that the several allegations of the amended bill of complaint, coupled with the exhibits when considered in their entirety, contained equity and the chancellor required and ordered an answer to the amended bill of complaint be filed by these defendants.

The petitioners (defendants below) simultaneously filed a motion to strike Sections 2, 3, 5, 6, 7, 8, 9, 10, 11, 12 and 13 and citations of authorities appearing on enumerated lines and designated pages of the amended bill of complaint. The chancellor, on April 3, 1943, by an appropriate order, granted the motion to strike as to Sections 3, 5, 7, 9, and 11 and part of Section 4, of the amended bill, but denied it as to all other Sections.

The case comes here on petition for an interlocutory writ of certiorari on the part of the defendants below seeking an order quashing the adverse ruling of the order dated April 3, 1943. The plaintiffs below (respondents here), by cross petition for an interlocutory writ of certiorari, seek a reversal of the order of April 3, 1943, striking portions of Section 4, Sections 3, 5, 7, 9 and 11 of the amended bill of complaint. Presented on the pleadings here is the entire order of the chancellor based on the motion to dismiss and the motion to strike which were directed by the defendants to the amended bill of complaint.

The motion of the petitioners (defendants below) to dismiss the amended bill of complaint admits as true, for the purpose of a ruling thereon, all well pleaded allegations of fact, and recognizes the controlling principle of law to the effect that if the amended bill contains equity or may be the basis for equitable relief, the motion to dismiss should be denied. See City of Jacksonville v. Shaffer, 107 Fla. 363, 144 So. 892; Hyland v. Rodney, 143 Fla. 319, 195 So. 574. Section 22 of the Chancery Act (Chapter 14658, Acts of 1931) confers

on the chancellor power to strike pleadings either on motion of counsel or *ex mero mortu* which contained matter that is redundant, impertinent, irrelevant or scandalous which may be prejudicial. See Gulf Coast Seafoods, Inc. v. Williams, 140 Fla. 551, 188 So. 230.

Different phases of the activities and proceedings of the officers, agents or employees of the Baldwin Drainage District since its establishment by an order of the circuit court under the several provisions of Chapter 6458, *supra,* have been presented, considered and ruled upon by the courts. See Bostwick v. Baldwin Drainage District, 133 Fed. (2nd) 1, 63 S. Ct. 1030, 87 L. Ed. 927; Duval Cattle Co. v. Hemphill, 41 Fed. (2nd) 433; Kritemeyer v. Baldwin Drainage District, 298 Fed. 604; Kritemeyer v. Baldwin Drainage District (Fla. Nat'l. Bank, Intervenor), 2 Fed. Supp. 208; Hemphill v. Florida National Bank, 30 Fed. (2nd) 892; Florida Nat. Bank of Jacksonville v. Hemphill, 68 Fed. (2nd) 785.

Counsel for petitioners contend that the authorities cited and relied upon to support the order of the lower court in striking Section 5 of the amended bill of complaint are likewise applicable to Section 6, and the order striking paragraph 5 and sustaining Section 6 are irreconcilable. Counsel for cross-petitioners (respondents) contend that Section 5 of the amended bill should never have been stricken and that part of the order constitutes reversible error.

Counsel for cross petitioners emphasize irregularities of: (a) published notice; (b) the contents of the original petition of incorporation; (c) the description of land; (d) the lack of the owners names opposite the legal descriptions, which were approved and ratified by the order of the circuit court dated January 16, 1916. A substantial compliance, it is contended, has never been made with Sections 2, 3, 12, 18, 22, and 39 of Chapter 6458, *supra,* and because of these jurisdictional defects the decree creating and establishing the Baldwin Drainage District is void *ab initio,* and may be collaterally attacked. If this contention is sound, then the order of the circuit court is a mere *brutum fulmen* and controlled by Kroier v. Kroier, 95 Fla. 865, 116 So. 753; Watkins v. Johnson, 139 Fla. 712, 191 So. 2.

It is generally recognized that the organization of a drain-

age district cannot be collaterally attacked. See 28 C.J.S. pp. 333-36, par. 36. The Court entering the order had before it the published notice, observed its contents, and was fully advised on the question of whether or not there was a substantial compliance with Section 2 of Chapter 6458, *supra.* Some twenty-five years, or more, after the decree of organization had been signed and recorded, it is contended the decree: (a) did not contain the names of any of the owners of the land; or (b) the legal description of the land within the district; (c) without the names of the owners and a description of the land, assessments of benefits and damages could not be entered. There are no allegations in the amended bill of complaint as to fraud or collusion so as to bring Section five of the amended bill within the rule enunciated in State ex rel. Lorenz v. Lorenz, 149 Fla. 625, 6 So. (2nd) 620. The order of the chancellor striking Section 5 of the amended bill was free from error in the absence of an allegation to the effect that the Court was without jurisdiction of the parties and the subject matter. If a court of general jurisdiction has ruled, and the ruling is within the scope of its general powers, it will be presumed upon collateral attack that the Court had jurisdiction of the subject matter and of the parties, unless the contrary appears of record. See Bemis v. Loftin, 127 Fla. 515, 173 So. 683; Catlett v. Chestnut, 107 Fla. 498, 146 So. 241, 91 A.L.R. 212; Fieche v. R. E. Householder Co., 98 Fla. 627, 125 So. 2.

Section 6 of the amended bill alleged that the circuit court had no jurisdiction or power under Chapter 6458, *supra,* or the State or Federal Constitutions to enter the decree dated January 16, 1916, created or establishing a drainage district of the described lands; that the drainage area is not a contiguous body of wet or overflowed lands subject to overflow; that the drainage area constitutes four separate watersheds requiring four distinct drainage systems; that the court had judicial notice of the physical characteristics of the drainage district when entering the challenged decree; the four separate watersheds, wholly unrelated in interest, created by the decree based upon Chapter 6458, *supra,* casts upon all the property of the drainage district a burden not authorized by

the State and Federal Constitutions; that large sums of money have been collected and wasted in effort of reclamation; and additional levies will be made and further sums wasted from year to year in the drainage effort, and will be so done without due process of law or the equal protection of the law. Ocean Beach Heights, Inc. v. Brown-Crummer Inv. Co., 302 U. S. 614, 58 S. Ct. 385, 82 L. Ed. 478, and other cases are cited to sustain the contention.

Our study of this section led us to a conclusion different from the one reached by counsel for respondents and the lower court. We agree that the applicable rule precluding a collateral attack on the organization of a drainage district is inapplicable to one asserting that the district has no de facto existence, e.g. that it was organized under a void statute or that the proceedings before the tribunal organizing the district were void for want of jurisdiction. See 17 Am. Jur. par. 24, p. 793; a8 C.J.S. par. 36, pp. 333-36.

Section 6 failed to allege that the Circuit Court of Duval County, Florida, on January 16, 1916, when entering the order creating the drainage district, acted without jurisdiction of the subject matter or that Chapter 6458 was void and unconstitutional. The motion to strike Section 6 should have by the lower court been granted with authority to amend if desired.

Section 7 of the amended bill alleged that the Circuit Court of Duval County did not have the jurisdiction to enter the order appointing designated commissioners to inspect and assess benefits and damages to the lands situated within the drainage district or to enter the order dated October 4, 1916, which approved the report of the commissioners. It is contended that the published notice being in the form of an *in rem* proceeding, failed to contain a sufficient legal description of the affected lands or the names of the parties owning the land, and that the provisions of Section 14 of Chapter 6458, *supra,* were ignored or disregarded and for these several reasons the orders are void *ab initio.* We cannot agree to this contention because Section 14 is directory rather than mandatory. We fail to find error in the order striking Section 7. See 17 Am. Jur. par. 35, pp. 799-800, par. 76, pp. 824-825; 28

C.J.S. par. 62-63, pp. 417-419; Greene v. Uniacke, 46 Fed. (2nd) 916, certiorari denied in 283 U.S. 847, 51 S. Ct. 493, 75 L. Ed. 1455; Halifax Drainage District v. Gleaton, 137 Fla. 397, 399, 198 So. 374.

Section 8 alleges that plaintiffs' land located within the drainage district when organized and at the present time was cut-over and was limited only to grazing and reforestation purposes, and valued at about $5.00 per acre; that the soil is poor and cannot by drainage be made fertile like the lands of the Everglades Drainage District, and this was known 'to the drainage commissioners when filing their report as to assessment benefits and damages; that the market value of lands within the drainage district and land immediately adjoining and surrounding the lands of the district are the same; that a federal jury in a condemnation proceeding placed the value of $5.00 per acre on 2600 acres within the district; that the Commissioners, on the same land, reported benefits ranging from $30.00 to $40.00 per acre; that the commissioners knew or should have known that the improvements could not enhance the value of the land from $4.00 to $25.00 and to $40.00 per acre, being the amount of the benefit assessments.

Section 4, 5, and 6 of Tp. 2 So. Range 23, East, called for ditches of equal yardage costing $554.40. The ditches on 4 and 5 had no outlet, while the ditch through Section 6 emptied into a swamp. The ditches were not constructed but as against this estimated cost of $554.40 per ditch across the three Sections estimated benefits were viz: Section 4, the sum of $21,620.00; Section 5, the sum of $21,630.00, and Section 6 the sum of $22,750.00, which was forty times the estimated cost of the proposed ditches. Other assessments of benefits to lands situated within the drainage district ranged from eight to forty times the estimated costs of the construction. The order challenged approved and confirmed the report of the Commissioners.

The constitutionality of Chapter 6458, *supra,* under which the Baldwin Drainage District was established, was decided by this Court in Burnett v. Greene, 105 Fla. 35, 144 So. 205. Assessment benefits were considered but not decided. See Redman v. Kyle, 76 Fla. 79, 80 Fla. 300. Irregularities in

drainage assessments for benefits ordinarily will not be considered by a court of equity. See 28 C.J.S. par. 75, p. 447. The exception thereof is to the effect where it has been made to appear that the proposed drainage will not benefit lands assessed or where the assessment is grossly in excess of the benefits, the landowners may have a standing in a court of equity. See 19 C. J. par. 262, pp. 746-7; Gibbs v. Drainage Commissioners, 175 N.C. 5, 94 S.E. 695; Thomas v. Kansas City So. Ry., 261 U.S. 481, 43 S. Ct. 440, 67 L. Ed. 758, 277 Fed. 708; 28 C.J.S. par. 75, pp. 449-50; 17 Am. Jur. par. 67, pp. 218-20; Myles Salt Co. v. Iberia Drainage Dist., 239 U. S. 478, 60 L. Ed. 392; 36 S. Ct. 204; Pomeroy's Equity Jurisprudence, Vol. 1, (5th Ed.) par. 260, pp. 529-33. Grants of power to tax must be strictly construed. Cooley on Taxation, Vol. 1 (4th Ed.), par. 125, p. 284. Courts may enjoin collection where assessments were made on a wrong basis, resulting in over-valuation. Cooley on Taxation, Vol. 4 (4th Ed.) par. 1651, p. 3342. The order of the lower court denying the motion to strike is quashed as to Section 8, but the respondents are permitted to file an amended Section 8, with directions to restrict the allegations of over-valuation in assessments to the lands of the plaintiffs rather than generally or to the entire district, in the absence of an allegation that the respondents sued for a class similarly situated and interested.

Section 3 of the amended bill alleged that all levies of installment taxes annually since 1924 on the described lands of the plaintiffs more than three years of age are barred by Subsection 5 of Section 4663, C.G.L., being the three years statute of limitations. The chancellor sustained a motion striking Section 3. We fail to find error in this ruling. Careful consideration has been given to the several allegations of Section 4 of the amended bill, sustained by the order of the chancellor and here contended that the same should be stricken. We cannot agree to this contention. Sections 9 and 11 of the amended bill were properly stricken by the challenged order dated April 3, 1943.

Section 10 of the amended bill alleges that the Board of Supervisors was without power to award the contract of drainage dated September 26, 1918, to a designated firm and

in exchange for the work according to the terms of the contract, the remaining amount of $300,000.00 of bonds of the district; that the statute then applicable to awarding contracts, being to the lowest and best bidder after due advertisement, was not observed by the supervisors, and the case of Lassiter & Co. v. Taylor, 99 Fla. 819, 120 So. 14, 69 A.L.R. 689, is cited and relied upon.

The answer to these charging allegations is found in Section 16 of Chapter 6458, *supra*. The supervisors are granted power and authority to build, construct, and complete any and all works and improvements to carry out the plans of reclamation. They were authorized to employ labor and teams, purchase machinery, employ men, and direct the construction work and improvements, or enter into a contract for the work with the lowest and best bidder, requiring a bond as security, conditioned that the contractor would well and promptly carry out the contract for such work and improvements. It is to be observed that broad, liberal and almost limitless powers are conferred upon the supervisors. Approximately twenty-five years after the awarding, carrying out and payment under the terms of the contract, it is contended the whole procedure is illegal and void ab initio, because the contract was not awarded to the lowest bidder. We cannot agree to this contention. The chancellor should have sustained the motion to strike Section 10 of the bill.

Sections 12 and 13 of the amended bill have been considered in light of the grounds of the motion to strike. The plaintiffs below (respondents here) have never asserted ownership of all the lands in the drainage district, but a description of the property owned by the plaintiffs is set forth in other Sections thereof. It is the lands of the plaintiffs described as having never received benefits or the drainage work was abandoned or never completed by the supervisors, as applicable to the described lands of the plaintiffs, where the assessment benefits exceed the value of the improvements; that evidence may be offered by plaintiffs in support of other allegations of the amended bill. It is our conclusion that the motion to strike should have been sustained as to Sections 12 and 13 of the amended bill. The

motion to strike Sections 14 and 15 was properly over-ruled.

Petitioners contend that the amended bill of complaint should have been dismissed because this Court, in the case of State ex rel. Watson v. Covington, 148 Fla. 42, 3 So. (2nd) 521, held that the Baldwin Drainage District was a de facto district and this issue having been placed at rest it cannot now be re-litigated as attempted by the allegations of the amended bill. In the case of Quigley v. Cremin, 94 Fla. 104, 109 So. 312, we held that the defense of res adjudicata may be raised by demurrer where the facts supporting it sufficiently appear from the bill of complaint. See Keen v. Brown, 46 Fla. 477, 35 So. 401.

In the amended bill of complaint, by appropriate allegations, it has been made to appear that described property of the named plaintiffs is being taken without due process of law and the equal protection of the law: and they are being deprived of rights vouchsafed by the State and Federal Constitutions. It appears that under these allegations the plaintiffs have a standing in court and should be heard and their claims or issues on final hearing adjudicated. If these claims or issues were adjudicated in State ex rel. Watson v. Covington, *supra,* then the burden of establishing it with sufficient accuracy and certainty by the record or intrinsically rests on the party who claims the benefit of the former adjudication. See Prall v. Prall, 58 Fla. 496, 50 So. 867, 26 L.R.A. (NS) 577; Gray v. Gray, 91 Fla. 103, 107 So. 261; Bagwell v. Bagwell, 153 Fla. 471, 14 So. (2nd) 841. Our ruling in State ex rel. Watson v. Covington, *supra,* may be presented as defensive matter. The de facto existence of the drainage district is not here challenged but alleged void and illegal drainage tax assessments against the described lands of the plaintiffs.

The amended bill seeks a cancellation of the special assessments that have been levied against the described lands of the plaintiffs from year to year up to the time of filing suit and to restrain a continuation of these levies. It is alleged that the effect of these levies is to take the property of the plaintiffs without due process of law and is a denial of the

equal protection of the law because the assessments are grossly in excess of the benefits; that the assessments cannot and have not enhanced the value of plaintiffs' lands; that the drainage of the district was not completed but abandoned as to some of the described lands; and as an example it is also alleged that Sections 4, 5 and 6 of Tp. 2, So. R. 23 E., according to the reclamation plans, were to be ditched at an estimated cost of $554.40 per Section and the ditches were never cut but assessment benefits against each of the Sections were entered for more than $20,000.00 per Section and plaintiffs' property is being taken or sold to satisfy or pay these alleged grossly excessive assessments on lands possessing a value of approximately $5.00 per acre.

Counsel for petitioners admit, for the purpose of a ruling on the demurrer, these well pleaded facts, but say the plaintiffs cannot now be heard because: (1) they are recent purchasers of the land and acquired it with full notice; (2) they are estopped by the running of time of approximately twenty-five years; (3) they are each guilty of laches and cannot have a standing or be heard in a court of equity. The answer to several contentions is: (1) the officers of the drainage district are mandatorily required to observe and carry out the provisions of Chapter 6458, *supra*; (2) assessments must be limited to accrued benefits by the terms of the Act; (3) actions to collect these assessments must be seasonably taken; (4) steps to collect these assessments were never undertaken by the officials; (5) it is equitable for the officers of the drainage district to remain inactive for twenty-five years, or more, without effort to collect the assessments, but inequitable after twenty-five years for plaintiffs below to seek their cancellation on constitutional grounds. Estoppel is founded upon principles of morality and fair dealings and the party setting up estoppel is required to exercise good faith. See 19 Am. Jur. par. 83-86, pp. 730-39; Tampa Waterworks Co. v. Wood, 104 Fla. 306, 139 So. 800.

Laches in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly. Prejudicial delay or laches was

treated in Pomeroy's Equity Jurisprudence, Vol. 2 (5th Ed.), par. 419d, pp. 177-78, thusly.

"419d. Necessity for Prejudicial DeLay.—While statements are to be found in some of the cases intimating that unreasonable delay, and mere lapse of time, independently of any statute of limitations, constitute a defense in a court of equity, the generally accepted doctrine appears to be that laches is not like limitation a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the condition or relations of the property or the parties. Where no one has been misled to his harm in any legal sense by the delay, and the situation has not materially changed, the delay is not fatal. . . ."

Section 4 of the Declaration of Rights provides that all courts of Florida shall be open, so that every person for an injury done him in his lands, goods, person or reputation shall have a remedy, by due course of law, and right and justice shall be administered. We do not have before us a suit seeking an ouster from the drainage area of plaintiffs' land, or one questioning the franchise rights and privileges of the district, but one in equity seeking a decree of cancellation of grossly excessive assessments of benefits and restraining future assessments and the enforcement of similar unconstitutional assessments.

The negotiability of the bonds of the Baldwin Drainage District held by the defendants, coupled with the further question of whether or not the drainage taxes of the district are on a parity with the State and County taxes, on the present state of the record is not material. We do consider but decline to rule upon either of these questions.

I think the writ of certiorari should be denied the cross petitioners (respondents) and the petitioners, except as to that portion of the order of the lower court of April 3, 1943, which denied petitioners' motion to strike Sections 6, 8, 10, 12, and 13 of the amended bill of complaint. The writ should be granted and Sections 6, 8, 10, 12 and 13 of the amended bill of complaint quashed but the respondents should have permission to file an amended Section 8.

## ON REHEARING.

PER CURIAM:

A rehearing having been granted in this cause and the cause having been further considered upon the record and upon the briefs and oral argument of counsel for the respective parties; it is thereupon ordered and adjudged that the opinion and judgment of this Court filed on April 4, 1944 be and is hereby reaffirmed and adhered to on rehearing.

TERRELL, BROWN, CHAPMAN, THOMAS, ADAMS, JJ., and WELCH, Circuit Judge, concur.

BUFORD, C. J., and SEBRING, J., disqualified.